# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

ALEXANDER GREEN,
             Defendant.



**REPORT AND**
**RECOMMENDATION**
14-CR-6038-EAW-JWF

## Preliminary Statement

On March 27, 2014, defendant Alexander Green (hereinafter the "defendant" or "Green") and his brother Charles Green were indicted on one count of conspiracy to possess with the intent to distribute 100 kilograms or more of marijuana in violation of 21 U.S.C. § 841, and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956. See Indictment (Docket # 1). On April 10, 2015, defendant filed omnibus motions arguing that, inter alia,[1] physical evidence and statements from three separate stops should be suppressed. See Omnibus Motion (Docket # 82). The Court held evidentiary hearings regarding the stops on March 30, 2016 (see Docket # 139), January 9, 2017 (see Docket # 206), January 10, 2017 (see Docket # 208) and January 19, 2017 (see Docket #

---

[1] As part of his omnibus motions, defendant moved to dismiss Count One of the Indictment. The parties briefed and the Court held several hearings regarding the motion to dismiss. The Court issued its Report and Recommendation regarding the motion to dismiss on June 27, 2016. See Docket # 157. Judge Wolford denied defendant's motion to dismiss and affirmed this Court's Report and Recommendation on December 7, 2016. See Docket # 199.

210). Defendant filed his post-hearing brief on May 5, 2017 (see Docket # 232), and the government filed its post-hearing brief out of time on July 13, 2017 (see Docket # 252).

On July 18, 2017, the government moved for the Court to accept its post-hearing brief out of time (Docket # 253), the defendant opposed the motion on July 27, 2017 (Docket # 257), and the government replied on July 28, 2017 (Docket # 258). Oral argument was held on July 31, 2017, wherein the Court granted the government's motion to file the late post-hearing brief, but reserved decision on the defendant's argument that the time in between when the government filed its post-hearing brief and when that brief was due should be counted against the government for purposes of the speedy trial clock. See Docket # 259. The Court granted the parties time to file replies to their post-hearing briefs, which defendant did on August 16, 2017 (Docket # 266), and which the government did on August 23, 2017 (Docket # 270).

The following is my Report and Recommendation as to defendant's motions to suppress. See Docket # 82. Each of the stops at issue are separately addressed below. The defendant's speedy trial clock arguments will be addressed in a separate Decision and Order.

## I. March 10, 2011 Stop in Jackson County Oregon.

Factual Findings: At around 1:30 a.m. on March 10, 2011, Oregon State Highway Patrol Trooper Brent Sitowski observed, using radar, a car travelling "72 miles per hour in a 55 mile per hour speed zone." Hearing Transcript, Jan. 9, 2017, Docket # 217 (hereinafter "Tr. 2"), at 11, 14. Trooper Sitowski stopped the car and approached the passenger window where he observed a "strong odor of [fresh] marijuana." Id. at 16-18. Trooper Sitowski testified that he knew the odor to be that of fresh marijuana because southern Oregon is "kind of known as the mecca for marijuana in our—in the nation." Id. at 18-19.

Brandon Lewis ("Lewis"), the driver of the car, produced his driver's license. Defendant, the passenger in the car, also produced his license and told Trooper Sitowksi that he had rented the vehicle. Id. at 19-20. Trooper Sitowski observed that the driver, Lewis, "had kind of slow movements when he was looking around for documentation; his eyes were watery and bloodshot; and he just kind of overall appeared lethargic." Id. at 20-23. After obtaining the license information, Trooper Sitowski contacted his dispatcher by radio to run record checks on the occupants. Around this time during the traffic stop, Trooper Damien Hillyer arrived on the scene in a separate police vehicle. Id. at 20-21.

Based the time of day, the driver's appearance, and the "overwhelming odor of fresh marijuana," Trooper Sitowksi began an

3

investigation of Lewis for driving under the influence. Id. at 24. He asked Lewis to step out of the car and Lewis complied. Id. at 24-25. Green remained in the vehicle. Id. at 25. While Trooper Sitowski spoke with Lewis, Trooper Hillyear remained at the passenger side of the car where he conversed with the defendant. Hearing Transcript, Jan. 10, 2017, Docket # 218, (hereinafter "Tr. 3") at 8-9. Green told Hillyear where he was coming from and where he was going. Id. at 9-10. Trooper Hillyear immediately noticed the smell of marijuana emanating from the car. Hillyear asked Green whether he had an Oregon medical marijuana card and Green replied no. Id. at 10. The defendant grew nervous during this discussion and stated he did not smoke marijuana, but that Lewis may have smoked marijuana earlier that night. Id. at 11.

Meanwhile, Lewis informed Trooper Sitowski that his license may have been suspended in Oregon. Tr. 2, at 25. He also admitted that he had consumed one beer and smoked a marijuana joint earlier in the night. Id. at 26. Lewis indicated that there was no more marijuana in the car. Id. at 27. At 1:39 a.m., Trooper Sitowski advised Lewis of his Miranda rights and then administered a field sobriety test. Lewis passed the walk-and-turn test and missed two out of six points in the horizontal nystagmus test, indicating to Trooper Sitowski that Lewis had consumed alcohol but was not intoxicated. Id. at 29.

4

Trooper Sitowski then asked Lewis if he had a medical marijuana card and Lewis responded that he did not. Id. at 30. Trooper Sitowski explained to Lewis that the smell of marijuana was emitting from the vehicle and again asked Lewis if there was any marijuana in the car. Id. at 30. Lewis then admitted that there was a marijuana joint in his motorcycle jacket, which was located inside the vehicle. Id. at 31. Trooper Sitowski asked Lewis for "consent to search the vehicle and all of its contents for any narcotics or contraband or firearms." Id. at 31. At 1:51 a.m., Lewis agreed and signed the Oregon State Police's standard consent form, which authorized a search of the entire vehicle, not just a limited search to retrieve the jacket. Id. at 32-33.

Prior to searching the vehicle, Trooper Sitowski asked Green to step out of the car. Id. at 33. Trooper Sitowski testified that Green "appeared visibly intoxicated and . . . smelled like alcohol." Id. at 33. Green agreed to a pat-down of his person and Trooper Sitowski found two cell phones. Id. at 34. Trooper Sitowski told the defendant that Lewis had admitted to having a small amount of marijuana in the car and further explained that less than one ounce of marijuana was not a criminal offense in Oregon. Id. at 37-38. Trooper Sitowski asked Green if he could search the vehicle and the defendant responded, "it seems like I should talk to a lawyer" and "I didn't even know we had pot in the car." Id. at 39. Trooper Sitowski testified that his request to

5

search the vehicle made the defendant appear "extremely nervous." Id. at 40. Ultimately, Green agreed to allow Trooper Sitowski to retrieve Lewis's jacket from the car. Trooper Sitowski presented the defendant with the same general consent form to search the entire vehicle, which Green signed at 2:01 a.m. Id. at 41. Based on his conversation with the defendant, Trooper Sitowski testified that he understood that the signed written consent had been verbally limited by Green to allow only the retrieval and search of the motorcycle jacket. Id. at 42. Green was then placed in the back of a patrol car but was not handcuffed. Id. at 42-43. While Trooper Sitowski was retrieving the jacket, he noticed an "overwhelming smell of marijuana emitting from the vehicle," an odor that was not consistent with the smell of the marijuana joint contained in Lewis's jacket. Id. at 44. Based on his observations during the traffic stop, Trooper Sitowski contacted his supervisor, and then called Senior Trooper Greg Costanzo, a K-9 handler, at 2:11 a.m. Id. at 44, 45, 107.

Trooper Costanzo testified that he was called by Trooper Sitowski "just after 2 in the morning." Id. at 107. Trooper Costanzo arrived on the scene at approximately 2:18 a.m., with his K-9, Cookie. Id. at 44-45, 107. He testified that he was able to arrive within seven minutes because he lived nearby. Id. at 111. Before deploying Cookie, Trooper Costanzo asked the other police officers present what gave them reasonable suspicion for the dog

6

sniff. Id. at 108. Satisfied that there was reasonable suspicion to conduct the K-9 sniff, Trooper Costanzo walked Cookie around the vehicle, id. at 108, and Cookie alerted to the trunk seam and the passenger door, id. at 109. After Cookie alerted to the outside of the car, Trooper Costanzo placed Cookie inside the rental car to conduct an interior sniff. Id. Cookie again alerted, this time in an area "near the back seat." Id.

After Cookie alerted to the car, Trooper Sitowski returned to the patrol vehicle and asked the defendant if anything else in the car belonged to him. Id. at 47. Green indicated that there may be a backpack in the car that did not belong to him. Id. at 48. Trooper Sitowski testified that based on his training and experience it is common for people to disassociate themselves from an object containing contraband. Id. at 49. Although Green had not given consent to search the entire vehicle, Trooper Sitowski conducted a probable cause search of the vehicle based on the marijuana smell emitting from the vehicle and the K-9 alert. Id. at 49.

In the trunk of the car, Trooper Sitowksi found a duffel bag that contained three vacuum sealed one pound packages of marijuana; a backpack containing two one pound packages of marijuana; a food sealer; unused vacuum seal bags; plastic gloves; rubbing alcohol; packaging peanuts; and USPS receipts addressed to New York. Id. at 49. Trooper Sitowski completed his search at approximately

7

2:32 a.m., at which point the defendant and Lewis were handcuffed and told they were under arrest. Id. at 50. Shortly after the defendant was put under arrest, Trooper Sitowski administered Miranda warnings to the defendant in the back of the police vehicle. Id. Trooper Sitowski then transported the defendant and Lewis to the Central Point police station. Id. at 51. Green was not re-advised of his Miranda rights at the police station. Id. at 123.

Upon arriving at the station, Trooper Sitowski informed Trooper Brian Powers that Green had been "Mirandized" at the scene of the traffic stop. Hearing Transcript, Jan. 19, 2017, Docket # 219 (hereinafter "Tr. 4"), at 8. At approximately 4:00 a.m., Trooper Powers began to interview Lewis in the interview room while the defendant waited in the report writing room. Id. at 10-11. About an hour later, Trooper Powers met with Green for an interview. Id. at 11. Trooper Sitowski sat in on the interview. Id. at 12. Green was not restrained or in handcuffs. Id. at 15. Trooper Powers told Green that he wanted to record their discussions, but the defendant stated he did not feel comfortable recording the interview. Id. at 12. The defendant asked if he needed an attorney, to which Trooper Powers responded that "it was his choice, if he wanted to call an attorney, he could certainly do that." Id. Green, however, stated that he wanted to cooperate. Id. Trooper Powers did not re-advise defendant of his Miranda

8

rights. Id. at 13. The interview lasted for approximately one hour, after which Green was placed in a report writing room where he could be monitored by other troopers. Id. at 13, 16.

At around 9:00 a.m., Trooper Powers decided to interview defendant again to obtain more information about his involvement in a marijuana operation. Id. at 17, 37. DEA Agent Clark Wheeler sat in on this interview. Id. at 16-17. Trooper Powers asked again to record the interview and this time Green agreed. Id. at 12-13, 17-18. Green was not re-advised of his Miranda rights prior to the second interview. Id. at 17. During the second interview, at approximately 9:45 a.m., Trooper Powers asked the defendant for consent to search his phone, and Green replied that he wanted to talk to an attorney. Id. at 18. The interview promptly terminated. Id. at 18:21-23.

Discussion: Green challenges (1) the legality of the traffic stop, (2) the justification for and scope of the search of the Cadillac and (3) the admissibility of post-arrest statements he made to the police.

1. Legality of the Traffic Stop: The defendant "concedes that the initial stop of Green's rental car was lawful." See Docket # 232, at 5. The gravamen of Green's argument is that while the stop of the car may have been lawful at its inception, the delay between the traffic stop and the search of the rented

Cadillac during which the narcotics were found was unreasonable under the Fourth Amendment.

Green is correct in his assertion that law enforcement cannot unreasonably detain occupants of a car stopped solely for purposes of issuing a traffic ticket. In United States v. Harrison, 606 F.3d 42 (2d Cir. 2010), the Second Circuit summarized the law in this area:

> [E]ven a seizure that is "lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Illinois v. Caballes, 543 U.S. 405, 407 (2005). As applied to a traffic stop, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Id. Still, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 333 (2009).

606 F.3d at 45 (some citations omitted). In Harrison, as here, the defendant argued that once the officer "had all of the information needed to issue the traffic ticket," he was required to issue the ticket and allow the driver to proceed without further inquiry or delay. Id. The Second Circuit disagreed, holding:

> When a traffic stop is supported by probable cause, the occupants of the car have no "right to be released the instant the steps to check license, registration, and outstanding warrants, and to write a ticket, had been completed. . . . [T]he fourth amendment does not require the release of a person arrested on probable cause at the earliest moment that step can be accomplished. What the Constitution requires is that the entire process

10

remain reasonable." United States v. Childs, 277 F.3d
947, 953-54 (7th Cir. 2002) (*[e]n banc*).

Harrison, 606 F.3d at 45. Similarly, "[a] traffic stop may be
extended for investigatory purposes if an officer develops a
reasonable suspicion of criminal activity supported by specific
and articulable facts." United States v. Foreste, 780 F.3d 518,
523 (2d Cir. 2015) (citing United States v. Glover, 957 F.2d 1004,
1008 (2d Cir. 1992)).

According to Green, the "dog sniff unreasonably prolonged the
traffic [s]top," see Docket # 232, at 5-6, and "the stop was
unreasonably delayed after the driver passed the field sobriety
test," see Docket # 266, at 2-3. Green argues that forty-five
minutes elapsed between the stop of the Cadillac for speeding and
the arrival of the K-9 unit and that "a delay of at least 15 or 25
minutes in total" should be allocated to the unreasonable extension
of the duration of the traffic stop. See Docket # 232, at 7. Green
contends that the lack of "articulable, reasonable suspicion" of
any unlawful conduct offense other than the traffic violation
precludes the government from arguing that any delay beyond the
time necessary to issue a speeding ticket was constitutionally
permissible. See Rodriguez v. United States, ___ U.S. ___, 135 S.
Ct. 1609, 1616 (2015) (the "critical question" is "whether
conducting the [dog] sniff prolongs - *i.e.* adds time to - the
stop") (internal quotation and citation omitted)).

11

Applying the relevant legal principles to the facts adduced at the hearing confirms that there was no Fourth Amendment violation. Even assuming that the dog sniff could be considered to have "prolonged" the traffic stop, Trooper Sitowski had reasonable suspicion to believe that the occupants of the rented Cadillac might be engaged in criminal activity and the brief delay to secure the services of a drug detection dog was reasonable under the circumstances present here.

Reasonable suspicion is based on the totality of circumstances. The level of suspicion necessary to meet the standard "is considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Sokolow, 490 U.S. 1, 7 (1989). "Conduct as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity." United States v. Villegas, 928 F.2d 512, 516 (2d Cir. 1991) (an officer's suspicion of narcotics trafficking is reasonable if, considering the totality of the circumstances, "the conduct as a whole would appear suspect to one familiar with the practices of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer"); see United States v. Lawes, 292 F.3d 123, 127 (2d Cir. 2002) ("Reasonable suspicion is not a high threshold.").

Here, almost from the inception of the traffic encounter, Trooper Sitowski testified to facts that would allow a reasonably

12

well-trained police officer to quickly form a belief that "criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968). The stop for speeding occurred at 1:30 a.m. in an Oregon County that is known as "the mecca for marijuana . . . in the nation." Tr. 2, at 18. Trooper Sitowski approached the passenger side of the vehicle and as the window was rolled down he "immediately smelled a strong odor of marijuana emitting from the vehicle, fresh marijuana." Id. Based on his training and experience, Trooper Sitowski was able to distinguish the odor of burnt marijuana from "fresh" marijuana. Id. Although Lewis, the driver, indicated the vehicle was rented, neither the driver nor Green were able to locate the rental documents. The defendant gave Trooper Sitowski a New York State license and Sitowski noticed Green moved slowly, acted lethargic and his eyes were "watery and bloodshot." Id. at 20. Lewis told Trooper Sitowski that he had consumed alcohol and smoked marijuana earlier in that evening, but told Trooper Sitowski that there was no marijuana in the car and he did not have a medical marijuana card. Id. at 26, 30; Tr. 3, at 10. Trooper Sitowski read Lewis his Miranda rights and asked Lewis to exit the vehicle and perform a field sobriety test at 1:39 p.m. After completing the sobriety test, Trooper Sitowski informed Lewis "that the smell of marijuana emitting from the vehicle was not consistent with his previous statement of him saying that there was no marijuana in the vehicle." Tr. 2, at 30-31.

13

At this point Lewis admitted that he had a "marijuana joint" in his jacket that was in the car and gave oral and written consent for police to search the vehicle and all of its contents for drugs and firearms. Id. at 31; see Hr'g Ex. 7. Prior to retrieving Lewis's jacket, Trooper Sitowski asked Green to exit the vehicle and the defendant complied. Trooper Sitowski noticed that Green appeared visibly intoxicated and smelled like alcohol. See Hr'g Exs. 9-10. When Trooper Sitowski informed Green that Lewis admitted to having a small amount of marijuana in a jacket in the car, Green became "visibly nervous. . . . he was kind of fidgety, he was moving his arms around a lot . . . he appeared overall he was nervous." Tr. 2, at 38. Green asked "if we could just retrieve the marijuana joint from Mr. Lewis's motorcycle jacket and then they would be done." Id. at 40. Trooper Sitowski testified that based on his training and experience, Green's response was consistent with someone trying to disclose a small amount of drugs while trying "to possibly conceal something else in the car." Id. at 41. Trooper Sitwoski retrieved the jacket and found the marijuana joint in the left front pocket. Trooper Sitowski testified that the "overwhelming smell of marijuana coming from the vehicle" was not "consistent with a small marijuana joint retrieved from Mr. Lewis's jacket" and decided to request a K-9 unit respond to the scene for a dog sniff of the vehicle. Id. at 44. The request for the K-9 unit was made at 2:11 a.m., and the

14

dog and its handler arrived eight minutes later. Id. at 45. After
sniffing the vehicle, the dog alerted, indicating that narcotics
was present in the car. The dog's alert occurred at 2:22 p.m.
Id. at 47. Based on the overwhelming odor of marijuana coming
from the vehicle and the dog's alert to the vehicle, law
enforcement commenced a "probable cause search" of the vehicle and
its contents. Id. at 49.

The foregoing chronology pays tribute to the escalating
series of facts presented to Trooper Sitowski during the early
morning stop of the vehicle in which Green was riding -- facts
that provided law enforcement with ample justification to suspect
Green and/or Lewis were involved in criminal activity. Indeed,
the reasonable suspicion standard appears to have been easily
satisfied when Trooper Sitowski first approached the passenger
side of the Cadillac and detected a strong odor of fresh marijuana
coming from the inside of the car. At the time of the stop in
2011, possession of marijuana over one ounce was a felony and under
one ounce was a violation. See Or. Rev. Stat. § 475.864(3) (2013).
Therefore, based on the odors emanating from the car at the time
of the stop, the police reasonably believed that the vehicle
contained marijuana in excess of the legal limit in Oregon.
Contrary to defendant's arguments, the smell of marijuana alone
provided reasonable suspicion to prolong the traffic stop to
conduct the K-9 sniff. United States v. Jenkins, 452 F.3d 207,

214 (2d Cir. 2006) (smell of marijuana coming from vehicle provided independent basis for continuing to detain vehicle to question occupants). That suspicion was not dissipated as Green's encounter with law enforcement continued; in fact, it was heightened. Lewis's denial of any marijuana in the vehicle, the discovery of the marijuana joint in the jacket, Green's bloodshot eyes, nervous, fidgety behavior and the suggestion that police retrieve a joint from the jacket in return for ending the stop all contributed to the decision to extend the encounter until a canine unit arrived. See United States v. Rivera, 89 F. Supp. 3d 376, 412 (E.D.N.Y. 2015) (reasonable suspicion to prolong traffic stop to conduct K-9 search based on totality of the circumstances including odor of marijuana, nervousness of occupants, criminal histories of occupants, inconsistent answers about travel plans, and knowledge that area in which occupants were stopped was a drug corridor); see also United States v. Downs, 151 F.3d 1301, 1303 (10th Cir. 1998) (holding that where an officer encounters "the overpowering smell of raw marijuana, there is a fair probability that the car is being used to transport large quantities of marijuana and that the marijuana has been secreted in places other than the passenger compartment").

Having established that the continuation of the stop was justified, I turn to whether the delay was reasonable. Assuming *arguendo* that the smell of fresh marijuana did not, in and of

itself, satisfy the probable cause standard, (see United States v. Smith, 596 F. App'x 804, 807 (11th Cir. 2015) (smell of fresh marijuana gave officer probable cause to conduct a warrantless search of a car); United States v. Vasquez-Castillo, 258 F.3d 1207, 1213 (10th Cir. 2001) (when officer "detected the odor of raw marijuana," probable cause to search vehicle existed); United States v. Winters, 221 F.3d 1039, 1042 (8th Cir. 2000) (smell of raw marijuana "created probable cause to search the car and its containers for drugs")), the brief delay here was reasonable.

> In determining whether a reasonable-suspicion-based extension of a traffic stop for investigatory purposes is reasonable, courts consider (1) whether the officer's action was justified at its inception; and (2) whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

Foreste, 780 F.3d at 526.

Trooper Sitowski's action in stopping the car and continuing his investigation based on the smell of marijuana and the behavior and statements of Green and Lewis was justified. Moreover, by summoning the K-9 unit, which was quickly available to respond to the scene, the Troopers pursued a reasonable means of quickly confirming or dispelling their suspicions. The delay at issue here was not lengthy. The initial stop occurred at 1:30 a.m. Tr. 2, at 11, 14. Trooper Sitowski administered a field sobriety test to Lewis at 1:39 a.m. Id. at 27-29. Lewis consented to Trooper

17

Sitowski removing the marijuana joint from his jacket at 1:51 a.m. (id. at 32), and defendant consented to removing the marijuana joint from the jacket at 2:01 a.m. Id. at 41-45. Trooper Sitowski sought the K-9 sniff at 2:11 a.m. and the dog Cookie arrived at 2:18 a.m. Id. at 44-45. It is not clear how long the K-9 sniff lasted, but by 2:32 a.m., the K-9 sniff and the subsequent search of the vehicle were complete. Id. at 50. Therefore, the entire stop itself lasted slightly over an hour. The duration of the stop was extended, at most, from the time the jacket was retrieved, at around 2:01 a.m., to the time all searches had been completed, at 2:32 a.m. I find that under the circumstances present here, a thirty minute extension of a traffic stop was reasonable and did not violate the Fourth Amendment rights of the defendant. See Foreste, 780 F.3d at 526-27 (approving reasonableness of extensions of twenty-two minutes and a half an hour to dispel reasonable suspicion arising during course of traffic stop).

2. Probable Cause to Search Vehicle and Containers Within It: Green's argument that the police lacked probable cause to search the vehicle and its contents is without merit. Cookie's alert to the trunk seam and the passenger door of the vehicle (Tr. 2, at 109) gave the police probable cause to search the vehicle and the trunk for drugs. See Florida v. Harris, 568 U.S. 237, 247-48 (2013) (finding that a K-9's alert can establish probable cause if the government establishes the K-9 was reliable in detecting

drugs). In addition, the smell of raw marijuana established

probable cause to search the vehicle.

> The automobile exception "permits law enforcement to
> conduct a warrantless search of a readily mobile vehicle
> where there is probable cause to believe that the vehicle
> contains contraband." United States v. Navas, 597 F.3d
> at 497 (citing Pennsylvania v. Labron, 518 U.S. 938, 940
> (1996)). If an officer has probable cause to believe
> that a vehicle contains contraband, the permissible
> scope of the search extends anywhere within the vehicle
> that the contraband may be located, including containers
> or packages. Id. Where, as here, a vehicle emits the
> odor of a controlled substance, officers have probable
> cause to search anywhere in the vehicle in which the
> controlled substance may be located. See United States
> v. James, 2011 WL 6306721, *6 (S.D.N.Y. 2011) (search of
> knapsack found in vehicle justified by the odor of
> marijuana emanating from vehicle and knapsack), aff'd,
> 2013 WL 1459125 (2d Cir. 2013); United States v.
> Sheffield, 799 F. Supp. 2d 22, 32 (D.D.C. 2011) (odor of
> marijuana, unusual number of air fresheners and
> officer's knowledge of defendant's involvement in
> narcotics justified search of entire vehicle, including
> locked armrest compartment); United States v. Colon,
> 2011 WL 569874, *12 (S.D.N.Y. 2011) (denying suppression
> of gun where officers' detection of marijuana odor
> justified search of vehicle, including glove compartment
> where gun was found); United States v. Dixon, 2010 WL
> 3167381 at *3 (smell of burning marijuana provided
> probable cause to search entire minivan) (collecting
> cases); United States v. Johnson, 2010 WL 2271152, *3
> (M.D. Ala.) (smell of marijuana emanating from vehicle
> provided probable cause to search vehicle), report and
> recommendation adopted, 2010 WL 22171227 (M.D. Ala.
> 2010), aff'd, 445 F. App'x 311 (11th Cir. 2011); United
> States v. Gentle, 2008 WL 623400, *4 (D. Mass. 2008)
> ("the smell of marijuana coming from the car provided
> probable cause to search the vehicle for narcotics");
> United States v. O'Neal, 2001 WL 1013306, *4 (D. Kan.
> 2001) ("once the troopers approached the Blazer and
> smelled burnt marijuana emanating from inside the
> vehicle, they had probable cause to search the
> interior").

19

United States v. Wiggins, No. 12-CR-6114L, 2013 WL 1645180, at *12 (W.D.N.Y. Apr. 16, 2013), report and recommendation adopted, No. 12-CR-6114L, 2013 WL 2553971 (W.D.N.Y. June 10, 2013).

Finally, contrary to the defendant's contention, the scope of the search here was proper. As this Court has found: "Where probable cause exists, the scope of the authorized search extends to all areas of the vehicle that could conceal the object of the search, including closed containers and packages." United States v. Dixon, No. 09-CR-6046, 2010 WL 3167381, at *3 (W.D.N.Y. May 26, 2010), report and recommendation adopted, No. 09-CR-6046L, 2010 WL 3167380 (W.D.N.Y. Aug. 10, 2010); see Wyoming v. Houghton, 526 U.S. 295, 307 (1999) ("[P]olice officers with probable cause to search a car may inspect passengers' belongings found in the car that are capable of concealing the object of the search."). Accordingly, it is my Report and Recommendation that Green's motion to suppress physical evidence should be **denied.**[2]

3. The Defendant's Statements: In his original moving papers, the defendant sought to suppress statements he made at the Oregon State Police Station in Central Point, Oregon because he was "not read his Miranda warnings" prior to making the statements. See Omnibus Motions (Docket # 82), at ¶ 47. The hearing testimony

---

[2] Because I find that the search of the car and the trunk was based on probable cause, I need not address whether the search would have been justified under a theory of consent. See Docket # 232, at 9.

belied Green's claim that he was never advised of his rights. Tr. 2, at 50, 56. Trooper Sitowski credibly testified that he read Green his rights off of a government-issued Miranda card after Green was arrested and placed into custody. Id. at 122; see id. at 27-28. Green acknowledged that he understood those rights. Id. at 51. Green did not move to suppress any statements he made at the scene of the traffic stop. I find that Green's post-arrest statements made at the station were made after the defendant had been fully and properly advised of his Miranda rights at the scene of the traffic stop. See Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (once a motorist who has been detained after a traffic stop "is subjected to treatment that renders him in custody for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda"). Accordingly, it is my Report and Recommendation that the defendant's motion to suppress statements be **denied**.

## II. November 8, 2013 Stop in Ukiah, California

Factual Findings: On November 8, 2013, Ukiah City Peace Officer Kevin Murray was on patrol in the Ukiah, California, with his K-9 "Thor." See Tr. 4, at 56-58. Officer Murray was travelling eastbound on East Gobbi Street, approaching the intersection of South Orchard Avenue. Id. at 58. As he approached the intersection, Officer Murray observed a car travelling westbound

21

on East Gobbi Street approaching South Orange Avenue.    Officer

Murray testified that he observed this car abruptly slow just

before the intersection, move to the furthest right lane of East

Gobi Street, and then perform a U-turn by travelling across the

turn lane and over the double yellow line to get onto the U.S. 101

southbound highway on-ramp, which the car had just passed.    Id. at

60.    Officer Murray followed the car and initiated a traffic

enforcement stop.    Id. at 62.    The vehicle yielded to Officer

Murray's emergency lights in the parking lot of a Hampton Inn.

Id. at 63.

Upon stopping the vehicle, Officer Murray provided his

dispatcher with the vehicle's license plate number and the location

of the stop.    Id. at 64-65.    Before Officer Murray approached the

vehicle, the dispatcher notified Officer Murray that the car was

a rental.    Id. at 65.    Upon approaching the driver's side window

of the vehicle, Officer Murray explained to the two occupants of

the car that he had made the stop for an illegal turning movement

by crossing over multiple lanes of traffic while performing a U-

turn.    Id. at 65-66.    Officer Murray obtained California

identifications from Aden McDonald ("McDonald"), the driver, and

Green, the passenger.    Id. at 66.    Officer Murray testified that

it was standard practice to ask for identification of all adult

occupants.    Id. at 103.

Noting that neither McDonald nor the defendant was from the area, Officer Murray asked McDonald and Green what brought them to Ukiah. Id. at 67. They responded that they were meeting with friends in Ukiah, whom they were supposed to call when they arrived to Ukiah, and that they were staying in the Hampton Inn where the stop occurred. Id. at 67-68. Officer Murray then asked the occupants whether there were any illegal narcotics or large amounts of United States currency, and they responded that there were not. Id. at 68. Officer Murray learned that the defendant was the lessee of the vehicle so he asked Green if he could search the vehicle. Id. at 69. Green consented to a search of the exterior of the car but said that Officer Murray could not search the interior. Id. Officer Murray testified that defendant agreed that Officer Murray could search the outside of the vehicle with his "K-9 partner." Id. at 70. On cross-examination, however, Officer Murray testified that defendant consented to searching the exterior of the car and that he was "sure" the defendant and McDonald were aware that Officer Murray had a K-9 with him because he was wearing a K-9 unit badge and his dog was likely barking. Id. at 106-107.

Prior to deploying his dog, Officer Murray called for a second unit and Officer Andrew Snyder responded. Id. at 70-71. When Officer Snyder arrived, he positioned himself at the driver's side while Officer Murray retrieved K-9 Thor from his patrol vehicle.

Id. at 71. Officer Murray directed Thor to begin a narcotics search around the exterior of the vehicle. Three to four minutes passed from the time Officer Murray approached the vehicle to the deployment of his K-9 partner. Id. at 125. When Thor reached the door seam that separates the front and rear passenger-side doors, Thor's behavior changed and he alerted on the door seam "just near the passenger side front door handle." Id. at 72. Shortly thereafter, Officer Chris Long arrived at the scene. Id. at 73.

Officer Murray informed the other officers that Thor had given a positive indication for the presence of illegal narcotics, and that he was going to direct the occupants of the vehicle to exit so he could conduct a search of the interior of the vehicle. Id. at 73. At this point, McDonald stated that he did not want Officer Murray to search the interior, but Officer Murray explained that the dog sniff had established probable cause to search. Id. at 73-74. The occupants exited the vehicle as directed.

Around the same time, Office Murray was notified that defendant was "possibly wanted on an outstanding felony warrant out of the State of Oregon." Id. at 74. Because it was not immediately apparent if the warrant was extraditable, Officer Murray asked his dispatcher to confirm the warrant and check whether it was for an extraditable offense. Id. at 75.

Based on the K-9 alert on the passenger side of the vehicle where the defendant was sitting, Officer Murray directed Green to

24

exit the car and patted him down, finding several thousands of dollars of United States currency and three cellular telephones on his person. Id. at 75-76. Green was handcuffed (it was not clear from the hearing testimony whether he was handcuffed immediately after Officer Murray learned of the warrant or immediately after the K-9 search, id. at 111-112) and placed in the back of the patrol vehicle pending confirmation on the warrant. Id. at 76-77. Officer Murray searched the passenger side of the vehicle with the assistance of Officer Snyder, where they found six more cellular telephones, two laptops and a black briefcase in the back seat. Id. at 77-78. Inside the black briefcase were plastic vacuum seal baggies, one of which had money inside it. Id. at 78. Green acknowledged that the briefcase belonged to him. Id. The officers also found a backpack in the back seat in which they found the sixth phone and a black notebook. McDonald admitted that this backpack belonged to him. Id. at 78.

Officer Murray testified that after the search was completed, and while the defendant was still handcuffed in the back of the patrol vehicle, Green stated, without being asked, that he was an authorized medical marijuana purchaser but that Oregon did not recognize him as an authorized purchaser. Id. at 81-82, 112-13. Officer Murray testified that the defendant indicated he was using the money to purchase medical marijuana. Id. at 118. Officer Murray testified:

The warrant that we were awaiting confirmation on was –
he said – he had told me that Oregon doesn't look at me
as an authorized medical marijuana purchaser either. He
goes on and related to me that he felt like the warrant
was for a similar situation to what was happening on the
day in question, that we're talking about in Oregon.

Id. at 81-82.

Green told Officer Murray that he believed he had about
$80,000 in cash (id. at 82), but upon counting the cash, Officer
Murray determined there was in fact $99,894. Id. at 83. Defendant
acknowledged that the money belonged to him. Id. at 83. Around
the same time, Officer Murray learned that the warrant was not
extraditable. Id. at 83-84. In consultation with a task force
officer, Officer Murray decided to release Green. Id. at 84-85.
He did not issue a traffic citation. Id. at 103. Officer Murray
testified that the occupants were detained for a total of about
thirty minutes to one hour from the time they were pulled over to
the time they left the scene of the stop. Id. at 111, 125.

Discussion: Green challenges (1) the justification for the
stop, (2) the legality of the search of the vehicle and (3) the
admissibility of the post-custody statements he made to the police.

1. Justification for the Vehicle Stop: Police officers need
only reasonable suspicion to initiate a traffic stop. Heien v.
North Carolina, __ U.S. __, 135 S. Ct. 530, 536 (2014). Reasonable
suspicion is "considerably less than proof of wrongdoing by a
preponderance of the evidence" and is "less demanding than that

26

for probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989). Here, Officer Murray observed the defendant's vehicle make what he believed to be an "illegal turning movement by crossing over multiple lanes of traffic over a double yellow line while performing a U-turn." Id. at 65-66. Section 22100(b) of the California Vehicle Code entitled "Turning upon a highway" provides that left turns

> shall be made as close as practicable to the left-hand edge of the extreme left-hand lane or portion of the roadway lawfully available to traffic moving in the direction of travel of the vehicle and, when turning at an intersection, the left turn shall not be made before entering the intersection.

Cal. Veh. Code § 22100(b). It is undisputed here that the driver of the rented Nissan Altima in which Green was a passenger did not initiate the turn from the extreme left-hand lane. Rather, the vehicle here initiated the turn from the extreme right-hand lane over the left-hand lane and then over the double yellow line. Tr. 4, at 60, 65-66. Accordingly, I find that the "turning movement" of the Nissan Altima observed by Officer Murray provided at least reasonable suspicion of a violation of section 22100(b) and therefore the stop of the vehicle was justified.[3]

---

[3] During the suppression hearing, and in his post-hearing briefs, Green argues that Officer Murray did not have probable cause or reasonable suspicion to believe that the driver of the Nissan Altima violated any section of California's Vehicle Code, including making an illegal U-turn. I need not specifically decide whether the driver in fact violated a particular section of the California Vehicle Code, because so long as Officer Murray's belief that the driver violated a traffic law was reasonable, any mistake in fact or law would not result in a violation of Green's Fourth Amendment rights. A reasonable mistake of fact or law does not undermine a reasonable suspicion determination.

27

2. The K-9 Sniff did not Unreasonably Prolong the Traffic

Stop: Green next argues that even if it is "determined that the stop itself was lawful, Officer Murray still unlawfully prolonged the traffic stop because he lacked reasonable suspicion to initiate a search for drugs." See Docket # 232, at 16. I disagree. A law enforcement officer may make certain off-topic inquiries and conduct checks during an otherwise lawful traffic stop so long as the officer "does not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Rodriguez, ___ U.S. ___, 135 S. Ct. at 1615. "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id.

Here, after approaching the vehicle and receiving identification from the occupants, Officer Murray noticed the driver was very nervous, stuttering, with "rapid, heavy breaths," and refusing to make eye contact with him. Tr. 4, at 66-67. Officer Murray ascertained that both occupants were from out of town and contacted his dispatcher to request that a record check

Heien, ___ U.S. ___, 135 S. Ct. at 536 (reasonable mistakes of fact or law by police in initiating a traffic stop do not vitiate the reasonable suspicion necessary to justify the Fourth Amendment seizure). Here, based on the suppression hearing testimony and my review of the pertinent sections of the California Vehicle Code, I find that any mistake of fact or law made by Officer Murray was reasonable.

28

be run on both the driver and Green. After learning that the vehicle had been rented by the defendant, Officer Murray asked if they had any illegal narcotics or large amounts of currency in the car. During this initial conversation, Officer Murray asked Green if he would allow a search of the vehicle by his "K-9 partner." Id. at 70. The defendant replied that he would not allow a search of the interior, but would consent to a dog sniff search of the exterior of the vehicle. Id. At this point, although Officer Murray had his K-9 partner (Thor) with him, he asked for back up to observe Green and the driver during the search. The hearing testimony made clear that the consent to search the exterior of the vehicle occurred very early on in the encounter, even before Officer Murray had completed the record check on the driver and Green. Id. No threats or coercion were used to intimidate Green into giving consent -- indeed Green did not hesitate to deny Officer Murray consent to search the interior of the rental car. What is important, however, is that Green gave his consent to search and, accordingly, any extension of the duration of the stop from that point forward was with the agreement and acquiescence of Green and not compelled by law enforcement. Green consented to extending the duration of the traffic stop, at least until Thor had completed his "sniff search" of the vehicle's exterior. When a motorist provides "consent to search the vehicle, he necessarily consented to an extension of the traffic stop long enough for the

officers to conduct the search." United States v. Davis, 460 F. App'x 226, 232 (4th Cir. 2011); see Rivera, 570 F.3d 1009, 1013-14 (8th Cir. 2009) ("When a motorist gives consent to search his vehicle, he necessarily consents to an extension of the traffic stop while the search is conducted."); see also Henry v. Tracy, 629 F. App'x 26 (2d Cir. 2015) (deputy sheriff had probable cause to extend period of detention to conduct search after K-9 alerted on vehicle trunk).

Thor conducted his search and alerted to the scent of narcotics in the vehicle. Id. at 73-74. Because Thor had been certified in 2013 as reliable to detect the smell of narcotics and Officer Murray was a trained dog handler, see id. at 55-56, Officer Murray had probable cause to search Green's rental vehicle. Harris, 568 U.S. at 248 (where training records established dog's reliability in detecting drugs and defendant failed to undermine that showing, officer had probable cause to search defendant's truck). Accordingly, the seizure of any contraband from the rental vehicle did not violate Green's Fourth Amendment rights.

3. Statements Made by Defendant While Handcuffed: Defendant seeks to suppress statements he made while handcuffed in the back of the police car while other police officers searched his vehicle. However, in its post-hearing brief, the government has stated that it does not intend to use any of these statements in its case-in-chief. See Docket # 252, at 21. Accordingly, it is my Report and

Recommendation that Green's motion to suppress statements should be **denied as moot**.

## III.  January 13, 2014 Stop in San Francisco Airport

Factual Findings:  Officer Blake Molyneaux is a member of the San Francisco Police Department and is assigned to a DEA Task Force that is physically located in the San Francisco International Airport.  The mission of the Task Force is to "control drug trafficking through the use of airports."  Tr. 1, at 8-9.  On January 13, 2014, Officer Molyneux received an email from DEA Special Agent David O'Neal who was located in Boston.  Agent O'Neal informed Officer Molyneux that an individual known as Alexander Green was flying into San Francisco International Airport with one piece of checked luggage.  Hearing Transcript, Mar. 30, 2016, Docket # 151 ("Tr. 1"), at 11-12.  The email provided Green's date of birth and seat number on the plane.  Officer Molyneaux conducted a check of the defendant's criminal history and discovered an outstanding arrest warrant from Oregon and a previous marijuana related conviction from New York.  Id. at 14-15.

Officer Molyneaux and four other officers in plain clothes waited for defendant to disembark the plane.  Officer Molyneaux had defendant's driver's license photograph so they could identify him.  Id. at 15.  Officer Molyneaux and the team observed Green exiting the aircraft and then walking to the luggage carousel

carrying a black tote bag. Id. at 16. Officer Molyneaux testified that Green appeared to be nervous as he waited for his luggage at the carousel. Id. at 17. Defendant retrieved a bag from the luggage carousel and proceeded to the Virgin Airlines customer service luggage counter, where he remained for a few minutes. Id. at 18.

When the defendant left the customer service counter, Officer Molyneaux, approached Green, identified himself as a member of the DEA Task Force, showed Green his credentials, and asked if he could speak to him for a minute. Id. at 19. The defendant agreed. Id. at 20. It was approximately 12:20 p.m. and their encounter occurred in a public area of the airport. Id. at 20. Officer Molyneaux testified that he was armed but his weapon was not visible. Id. Officer Molyneaux stated that shortly after he introduced himself to Green, Task Force Officer Ron Drake, also in plain clothes, identified himself and joined the conversation. Id. at 20. Officer Molyneaux advised Green that he was a member of a task force "attempting to control drug trafficking through the use of airports." Id. at 21-22. Officer Molyneaux advised the defendant that he was not under arrest and was free to leave or decline to talk with task force members. Id. at 22. Officer Molyneaux testified that other Task Force members were stationed nearby observing the encounter but he did not believe Green was "even aware of their presence at the time." Id. at 23.

Officer Molyneaux asked the defendant about the purpose of his travels and advised him that there was an outstanding warrant for his arrest. Id. at 24. Officer Molyneaux then asked Green whether he was traveling with any drugs and the defendant responded that he was not. Id. at 25. Officer Molyneaux asked for Green's permission to search his baggage and the defendant consented to a search, stating again that he did not have any drugs. Id. at 25-26. At this point Officer Drake inspected the contents of the checked piece of luggage and Officer Ariana Daggett searched the carry-on black tote bag. Id. at 27-28. Green was seated nearby while the search of his possessions was conducted. Id. at 28. At no time was Green restrained or informed he was under arrest. Id. at 29. Officer Daggett found currency in the tote bag and Officer Drake found currency in various parts of the checked luggage. Id. at 29.

Upon locating the currency, Officer Molyneaux asked defendant how much money he had in his possession and Green estimated that he was carrying about $80,000. Id. at 32. Officer Molyneaux ultimately counted the currency and determined that Green was carrying $120,330 in cash. Id. at 32. When asked by Officer Molyneaux why he had so much currency, Green responded that it was to pay his taxes, although it was unclear what year he was paying for and why so much cash was necessary. Id. at 32-33. Defendant stated that his bank account had been frozen after the Oregon stop.

Id. at 33.    Officer Molyneaux continued to inquire   about how
Green earned his income and, eventually, the defendant indicated
that he "didn't want to answer questions without his lawyer
present." Id. at 34-35. At that point, Officer Molyneaux stopped
asking defendant questions. Id. at 35.

The Task Force removed all the currency from Green's luggage
and informed him that the money was being seized because they
believed the money to be proceeds of a drug sale or money intended
to purchase drugs. Id. at 35-36, 52-53. Green was provided and
filled out a claim form for the money. He then retrieved his bags
and the encounter ended at 12:55 p.m., approximately 35 minutes
after it had begun. Id. at 37, 58-59. There is no dispute that
Green was never advised of his Miranda rights. Id. at 37-38.

Discussion: Green's primary argument is that his consent to
search his luggage violated the Fourth Amendment because it was
the result of coercion by law enforcement. See Docket # 232, at
22-23.

It is well-settled that unless a carefully defined exception
clearly applies, a warrantless search is "per se unreasonable."
Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz
v. United States, 389 U.S. 347, 357 (1967)).   One recognized
exception to the warrant requirement is a search that is conducted
pursuant to consent. Schneckloth, 412 U.S. at 219.   "So long as
the police do not coerce consent, a search conducted on the basis

34

of consent is not an unreasonable search." United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995). The prosecution bears the burden of proving that consent was voluntarily given. Schneckloth, 412 U.S. at 222. While the government's burden is not satisfied by showing a mere submission to a claim of lawful authority, Florida v. Royer, 460 U.S. 491, 497 (1983), consent "need not be expressed in a particular form but can be found from an individual's words, actions or conduct." United States v. Duetsch, 987 F.2d 878, 883 (2d Cir. 1993) (internal quotations and citations omitted). In determining whether or not consent to a search was freely given, the Court must look at the totality of the circumstances surrounding the consent. Schneckloth, 412 U.S. at 227. While knowledge of the right to refuse consent is a relevant factor, such knowledge is not a requirement of proving a valid consent. Id. at 235-46. The ultimate issue of whether the consent was in fact voluntary is "to be determined from the totality of all the circumstances." Id. at 223.

The government met its burden here to prove a valid consent. Indeed, there is little, if any evidence, to suggest the consent was the product of coercion. First, no threats, force or overt coercive tactics were used by law enforcement in their encounter with Green. Green was approached in the luggage carousel area of the San Francisco airport by Officer Molyneaux after the defendant had retrieved his luggage. Officer Molyneaux identified himself,

showed Green his credentials and asked if he could speak to him for a minute. Green agreed to speak to Officer Molyneaux and, at that point, Officer Drake joined them. Officer Drake also identified himself to Green. Second, both Officers Drake and Molyneaux were in plain clothes and, although both were carrying a firearm, their weapons were concealed and not visible. The encounter took place in a busy airport during the middle of the day and there were undoubtedly other members of the public coming and going. After informing the defendant that he was part of a task force charged with "attempting to control drug trafficking through the use of airports," Officer Molyneaux specifically advised Green that "he was not under arrest and was free to leave at any time." See Tr. 1, at 22. After conversing with the defendant about where he lived and the purpose of his travel, Officer Molyneaux told Green that he was aware Green had an outstanding arrest warrant issued as a result of the Oregon traffic stop. Officer Molyneaux asked Green if he was travelling with narcotics and Green said he did not have drugs with him. Finally, when Officer Molyneaux asked Green for consent to search his luggage, Green responded by putting his hands up in the air while stating "I don't have any drugs, go ahead." Id. at 25-26. Officer Drake then started to inspect the contents of checked luggage as well as Green's carry-on tote bag. Officer Drake was assisted by Officer Daggett in searching the defendant's luggage and bag.

36

Green was never restrained, frisked, handcuffed or restricted in any way during the search. Large amounts of United States currency were located in both the tote bag and the larger suitcase. The total amount of money found was determined to be in excess of $120,000. After discovering the money, Officer Molyneaux and the defendant conversed about the source of the funds. After telling Green that the money was going to be seized, the funds were placed in an evidence envelope and sealed. Officer Molyneaux gave the defendant a receipt for the seized funds and explained the forfeiture process to Green. Green was never arrested and, after the funds were seized, he proceeded on his way.

Based on the foregoing, there is no merit to Green's motion to suppress the funds seized from his luggage and tote bag. Officer Molyneaux's actions in attempting to interact with and question Green was entirely proper. "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." United States v. Drayton, 536 U.S. 194, 201 (2002). Green was not obligated to answer Officer Molyneaux's questions and was told he was not under arrest and was free to leave at any time. Green's decision to engage with law enforcement was knowing and voluntary. His freedom of movement was never

restricted and a "reasonable person would have felt free to terminate the encounter." Id.

Equally without merit is the claim that Green's consent to search his luggage was somehow coerced. No threats, ploys or deceptive tactics were used to obtain Green's consent. The encounter occurred in a public place and in broad daylight. There was no overwhelming show of force, raised voices or display of weapons. Officer Molyneaux's request for consent was polite, clear and unambiguous. Green's expression of agreement was equally unequivocal, indicated both by his verbal assent and the raising of his arms.

> In a society based on law, the concept of agreement and consent should be given a weight and dignity of its own. Police officers act in full accord with the law when they ask citizens for consent. It reinforces the rule of law for the citizen to advise the police of his or her wishes and for the police to act in reliance on that understanding. When this exchange takes place, it dispels inferences of coercion.

Id. at 207.

For these reasons, it is my Report and Recommendation that the defendant's motion to suppress the currency seized from his luggage and tote bag on January 13, 2014 be **denied.**[4]

---

[4] In his initial brief (Docket # 232) Green claims the government refused to produce the email received by Officer Molyneaux which prompted Officer Molyneaux's efforts to engage the defendant at the airport. The government's response set forth an accurate chronology of the Court's actions with respect to the email, including the disclosure of the email to defense counsel with Court-approved redactions. See Docket # 252, at 26. Since the un-redacted email and redacted email are available for appellate review (see Docket # 140), the Court is not aware of any further determination that needs to be made by the undersigned with respect to the email at issue.

## Conclusion

For the reasons stated above, it is my Report and Recommendation that defendant's motion to suppress statements and evidence (Docket # 82) is **denied**.

**SO ORDERED.**

JONATHAN W. FELDMAN
UNITED STATES MAGISTRATE JUDGE

Dated: Rochester, New York
November 3, 2017

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[1]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. See, e.g., Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** Thomas v. Arn, 474 U.S. 140 (1985); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**SO ORDERED.**

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:     November 3, 2017
           Rochester, New York

---

[1] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. United States v. Andress, 943 F.2d 622 (6th Cir. 1991), cert. denied, 502 U.S. 1103 (1992); United States v. Long, 900 F.2d 1270 (8th Cir. 1990).