UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



_____

UNITED STATES OF AMERICA,

**DECISION AND ORDER**

v.

14-CR-6038 EAW

ALEXANDER GREEN,

Defendant.

_____

## **INTRODUCTION**

Defendant Alexander Green ("Defendant") and the Government each ask the undersigned to review determinations made by United States Magistrate Judge Feldman, who handled pretrial matters in this case pursuant to 28 U.S.C. § 636(b)(1)(A)-(B). (Dkt. 9). Defendant has filed objections (Dkt. 297) to a Report and Recommendation issued by Judge Feldman on November 3, 2017 (Dkt. 281) ("the R&R"), recommending denial of Defendant's motion to suppress statements and evidence. The Government has appealed (Dkt. 290) Judge Feldman's Decision and Order (Dkt. 282) ("the D&O") finding that the speedy trial clock began running after the Government missed the deadline to file its post-suppression hearing brief.

Based upon this Court's *de novo* review, and for the reasons discussed below, the Court accepts and adopts the R&R and denies Defendant's motion to suppress. In addition, the Court disagrees that the speedy trial clock began running when the Government missed a filing deadline, and therefore, for the reasons discussed below, the D&O is reversed.

1

## PROCEDURAL BACKGROUND

On March 27, 2014, Defendant and his brother, Charles Green, were indicted on one count of conspiracy to possess with the intent to distribute 100 kilograms or more of marijuana in violation of 21 U.S.C. § 846, and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). (Dkt. 1). On April 10, 2015, Defendant filed omnibus motions arguing that, among other things, physical evidence and statements obtained from three separate stops should be suppressed. (Dkt. 82 at 14). Evidentiary hearings were conducted before Judge Feldman on March 30, 2016 (*see* Dkt. 151), January 9, 2017 (*see* Dkt. 217), January 10, 2017 (*see* Dkt. 218), and January 19, 2017 (*see* Dkt. 219). Defendant filed his post-hearing brief on May 4, 2017. (Dkt. 232). The Government filed its post-hearing brief out of time on July 13, 2017 (Dkt. 252), accompanied by a cover letter to Judge Feldman that Defendant conceded should be construed as a letter motion for late filing (Dkt. 282 at 6 n.2; Dkt. 257 at ¶ 23). The Government's brief was due June 19, 2017. (Dkt. 290 at 1).

On July 18, 2017, the Government filed a formal motion asking Judge Feldman to accept its post-hearing brief out of time. (Dkt. 253). Defendant opposed the motion on July 27, 2017 (Dkt. 257), and the Government replied on July 28, 2017 (Dkt. 258). Judge Feldman held oral argument on July 31, 2017, at which time he granted the Government's motion to file its post-hearing brief out of time but reserved decision on Defendant's argument that the time from when the Government's brief was due (June 19, 2017) until the date the brief was filed with the letter motion seeking an extension of time (July 13, 2017) should be counted against the Government for speedy trial purposes. (Dkt. 259).

Defendant sought permission to file a reply brief to the Government's post-hearing brief (Dkt. 257 at ¶¶ 24-26), which was granted, and Defendant filed his reply on August 16, 2017 (Dkt. 266). The Government filed its reply on August 23, 2017. (Dkt. 270). On September 22, 2017, and then again on October 23, 2017, Judge Feldman issued Orders indicating that the pending motion had been taken under advisement on August 23, 2017, and that further time was necessary to fully consider the motion. (Dkt. 272; Dkt. 280). Judge Feldman ultimately granted a continuance in the interests of justice until November 6, 2017, for purposes of the speedy trial clock. (Dkt. 280).

On November 3, 2017, Judge Feldman issued the R&R (Dkt. 281), and on November 7, 2017, he issued the D&O (Dkt. 282). The Government timely filed an appeal of the D&O on December 8, 2017 (Dkt. 290), and Defendant filed his memorandum in opposition to the appeal on January 5, 2018 (Dkt. 298). Defendant timely filed objections to the R&R on January 2, 2018 (Dkt. 297), and the Government filed its response to the objections on January 16, 2018 (Dkt. 299). The undersigned heard oral argument on January 29, 2018, at which time the Court reserved decision and took the matter under advisement. (Dkt. 313).

## I.    Defendant's Objections to the R&R

### A.    Standard of Review

A district court reviews a report and recommendation to which a party has timely objected under a *de novo* standard. Fed. R. Crim. P. 59(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is

made."); *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38 (2d Cir. 1997) (requiring a district court to make *de novo* determinations to the extent that a party makes specific objections to a magistrate judge's findings). The Court is not required to review *de novo* those portions of a report and recommendation to which objections were not filed. Fed. R. Crim. P. 59(b)(2) ("Failure to object in accordance with this rule waives a party's right to review."); *see Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009) (to trigger the *de novo* review standard, objections to a report "must be specific and clearly aimed at particular findings in the magistrate judge's proposal").

## B. Findings of Fact

The Magistrate Judge set forth his factual findings from the hearings held on March 30, 2016 (*see* Dkt. 151), January 9, 2017 (*see* Dkt. 217), January 10, 2017 (*see* Dkt. 218), and January 19, 2017 (*see* Dkt. 219), and, based upon this Court's *de novo* review of the record, the testimony and exhibits admitted during the hearings fully support those factual findings. The Court incorporates by reference those factual findings into this Decision and Order and summarizes only the facts relevant to Defendant's objections. Defendant does not dispute the basic facts of any of the three searches. (Dkt. 297 at 2). Rather, he objects to certain conclusions that the Magistrate Judge reached based on those facts. (*Id.*).

## C. The March 10, 2011, Stop in Jackson County, Oregon

Oregon State Highway Patrol Trooper Brent Sitowski ("Sitowski") observed, using radar, a car travelling "72 miles per hour in a 55 mile per hour speed zone" at about 1:30 a.m. on March 10, 2011, in Jackson County, Oregon. (Dkt. 281 at 3). He stopped the car and approached the passenger window where he detected a strong odor of fresh marijuana.

4

(*Id.*). Sitowski testified that he knew the odor to be that of fresh marijuana because Southern Oregon is "kind of known as the mecca for marijuana" in the nation. (*Id.*). Sitowski also observed that the driver of the car, Brandon Lewis ("Lewis"), "had kind of slow movements when he was looking around for documentation; his eyes were watery and bloodshot; and he just kind of overall appeared lethargic." (*Id.*). Both Lewis and Defendant, who was the passenger in the car, produced their driver's licenses, and Defendant informed Sitowski that he had rented the vehicle. (*Id.*). Sitowski then contacted dispatch to run record checks on Lewis and Defendant. (*Id.*).

Based on the time of day, Lewis's appearance, and the odor of fresh marijuana, Sitowski began to investigate Lewis for driving under the influence. (*Id.* at 3-4). Trooper Hillyear ("Hillyear"), who had also arrived on the scene, remained at the passenger side of the vehicle with Defendant. (*Id.* at 4). Hillyear noticed the smell of marijuana emanating from the car and asked Defendant whether he had an Oregon medical marijuana card. (*Id.*). Defendant replied that he did not. (*Id.*).

After advising Lewis of his *Miranda* rights and administering a field sobriety test at 1:39 a.m., Sitowski concluded that Lewis had consumed alcohol but was not intoxicated. (*Id.*). Sitowski then asked Lewis if he had a medical marijuana card (to which Lewis replied that he did not), explained that he could smell marijuana, and asked Lewis whether there was any marijuana in the car. (*Id.* at 5). Lewis admitted that there was a marijuana joint in his jacket located inside the vehicle. (*Id.*). Sitowski then asked Lewis for "consent to search the vehicle and all of its contents for any narcotics or contraband or firearms."

(*Id.*). Lewis agreed and signed the Oregon State Police's standard consent form authorizing a search of the entire vehicle at 1:51 a.m. (*Id.*).

Before searching the vehicle, Sitowski asked Defendant to step out of the car. (*Id.*). Defendant appeared visibly intoxicated and smelled of alcohol. (*Id.*). Defendant consented to a pat-down of his person, and Sitowski discovered two cell phones. (*Id.*). Sitowski informed Defendant that Lewis had admitted to having a small amount of marijuana and asked Defendant if he could search the vehicle. (*Id.*). Defendant responded, "It seems like I should talk to a lawyer," and, "I didn't even know we had pot in the car." (*Id.*). Sitowski testified that his request to search the vehicle made Defendant appear "extremely nervous." (*Id.* at 5-6). At 2:01 a.m., Defendant agreed to allow Sitowski to retrieve Lewis's jacket from the car and signed the same general consent form that Lewis had signed. (*Id.* at 6). Sitowski testified that he understood that Defendant's signed written consent form had been verbally limited to allow only the retrieval and search of the jacket. (*Id.*).

While retrieving the jacket, Sitowski noticed an "overwhelming smell of marijuana emitting from the vehicle," which was not consistent with the smell of the marijuana joint contained in Lewis's jacket. (*Id.*). Sitowski then contacted his supervisor and called Senior Trooper Greg Costanzo ("Costanzo"), a canine handler, at 2:11 a.m. (*Id.*). Costanzo and his canine, Cookie, arrived on the scene at approximately 2:18 a.m. (*Id.*). Satisfied that there was reasonable suspicion to conduct a dog sniff, Costanzo deployed Cookie, who alerted to the trunk seam and the passenger door. (*Id.* at 7). Cookie then sniffed the interior of the car and alerted to an area near the back seat. (*Id.*).

Based on the marijuana smell and the canine alert, Sitowski conducted a probable cause search of the vehicle. (*Id.*). He discovered a duffel bag containing three vacuum sealed one-pound packages of marijuana; a backpack containing two one-pound packages of marijuana; a food sealer; unused vacuum seal bags; plastic gloves; rubbing alcohol; packaging peanuts; and USPS receipts addressed to New York. (*Id.*). Sitowski completed his search of the vehicle at approximately 2:32 a.m., at which point Defendant and Lewis were arrested. (*Id.* at 7-8).

### D.    The November 8, 2013, Stop in Ukiah, California

On November 8, 2013, Ukiah City Peace Officer Kevin Murray ("Murray") observed a car commit what he believed to be a traffic infraction and initiated a traffic enforcement stop. (*Id.* at 21-22). Upon stopping the vehicle, Murray provided the vehicle information to dispatch and was notified that the car was a rental. (*Id.* at 22). Murray then approached the vehicle and explained to the occupants that he had made the stop for an illegal turn by crossing over multiple lanes of traffic while performing a U-turn. (*Id.*). Murray asked each occupant for identification and noted that neither the driver (Aden McDonald ("McDonald")) nor the passenger (Defendant) was from the area. (*Id.* at 22-23). Defendant and McDonald stated that they had friends in Ukiah and were staying at the Hampton Inn, where the stop occurred. (*Id.* at 23). Murray asked whether any illegal narcotics or large amounts of United States currency were in the vehicle, and the occupants responded that there were not. (*Id.*). Murray learned that Defendant was the lessee of the vehicle, and Murray asked Defendant if he could search the vehicle. (*Id.*). Defendant consented to a search of the exterior of the car but said that Murray could not search the

7

interior. (*Id.*). Officer Murray testified on direct examination that Defendant had agreed that Murray could search the outside of the vehicle with his "K-9 partner." (*Id.*). On cross-examination, Murray testified that Defendant consented to a search of the exterior of the car and that he was "sure" that Defendant and McDonald were aware that Murray had a canine with him because he was wearing a K-9 unit badge and his dog was likely barking. (*Id.*).

Murray's canine, Thor, alerted to the door seam near the passenger side front door handle. (*Id.* at 24). Murray then informed the other officer who had arrived on the scene that Thor had given a positive indication for the presence of illegal narcotics, that he was going to direct the occupants of the vehicle to exit, and that he would then conduct a search of the interior. (*Id.*). McDonald stated that he did not want Murray to search the interior, but Murray explained that the dog sniff had established probable cause to search. (*Id.*). The occupants exited the vehicle, as directed. (*Id.*).

Based on the canine alert to the passenger side of the vehicle, where Defendant was sitting, Murray patted Defendant down and found several thousands of dollars of United States currency and three cellular phones on his person. (*Id.* at 25). Upon counting the money, Murray determined that it totaled $99,894. (*Id.* at 26). Defendant was handcuffed and placed in the back of the patrol vehicle pending confirmation of whether an outstanding out-of-state warrant for Defendant's arrest was extraditable. (*Id.* at 24-25). Murray then searched the passenger side of the vehicle with the assistance of another officer, and they found six more cell phones, two laptops, and a black briefcase inside of which they found

plastic vacuum-sealed bags, one containing money. (*Id*. at 25). The officers also found a backpack in the back seat in which they found the sixth phone and a black notebook. (*Id*.).

### E.    January 13, 2014, Stop in San Francisco Airport

Officer Blake Molyneaux ("Molyneaux") is a member of the San Francisco Police Department and is assigned to a DEA Task Force located in the San Francisco Airport. (*Id*. at 31). On January 13, 2014, he received an email stating that Defendant was flying into San Francisco International Airport with one piece of checked luggage. (*Id*.). Molyneaux checked Defendant's criminal history and discovered an outstanding arrest warrant from Oregon and a previous marijuana related conviction from New York. (*Id*.).

Molyneaux and four other officers in plain clothes waited for Defendant to disembark the plane. (*Id*.). They observed Defendant exit the aircraft and walk to the luggage carousel carrying a tote bag. (*Id*. at 31-32). Molyneaux testified that Defendant appeared to be nervous as he waited for his luggage. (*Id*. at 32). Defendant retrieved a bag from the carousel and proceeded to the customer service counter, where he remained for a few minutes. (*Id*.). When Defendant left the customer service counter, Molyneaux approached him, showed his credentials, identified himself as a member of the DEA Task Force, and asked if he could speak to Defendant for a minute. (*Id*.). Defendant agreed. (*Id*.). At that point, Trask Force Officer Ron Drake ("Drake"), also in plain clothes, identified himself and joined the conversation. (*Id*.). Molyneaux advised Defendant that he was a member of a task force "attempting to control drug trafficking through the use of airports." (*Id*.). He advised Defendant that Defendant was not under arrest and was free to leave or decline to talk to Task Force members. (*Id*.). Molyneaux testified that other

Task Force members were stationed nearby observing the encounter but he did not believe that Defendant was aware of their presence. (*Id*.).

Molyneaux asked Defendant about the purpose of his travels and advised him that there was an outstanding warrant for his arrest. (*Id*. at 33). He asked Defendant if he was traveling with any drugs, and Defendant responded that he was not. (*Id*.). Molyneaux asked for Defendant's permission to search his baggage and Defendant consented, stating again that he did not have any drugs. (*Id*.). Drake inspected the contents of the checked luggage and a third officer searched Defendant's tote bag. (*Id*.). Defendant was seated nearby while the search was conducted, and at no time was he restrained or informed that he was under arrest. (*Id*.). The officers found currency in the tote bag and in various parts of the checked luggage, totaling $120,330. (*Id*.). Molyneaux asked Defendant why he had so much currency, to which Defendant responded that it was to pay his taxes. (*Id*.). Molyneaux continued to inquire about how Defendant earned his income, and Defendant eventually stated that he "didn't want to answer questions without his lawyer present." (*Id*. at 34). At that point, Molyneaux stopped asking Defendant questions. (*Id*.). There is no dispute that Defendant was never advised of his *Miranda* rights. (*Id*.).

**F.    Analysis**

Traffic stops must satisfy the Fourth Amendment's reasonableness limitation, as the detention of an individual during a traffic stop, even on a temporary basis, constitutes a "seizure" within the meaning of the Fourth Amendment. *United States v. Gomez*, 877 F.3d 76, 85-86 (2d Cir. 2017). Thus, in assessing Defendant's motion to suppress, the Court

must consider the legality of each initial stop, as well as the reasonableness of the duration of the stops and the searches conducted during the stops.

### 1. Jackson County Stop

#### a. Legality of the Initial Stop

"Traffic stops are presumptively reasonable under the Fourth Amendment if the officer has probable cause to believe that a traffic infraction has occurred." *United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015). Here, Defendant does not challenge the legality of the initial stop, and the R&R concluded that Defendant "concedes that the initial stop of [Defendant's] rental car was lawful." (Dkt. 281 at 9).

#### b. Duration of the Traffic Stop

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, ___ U.S. ___, 135 S. Ct. 1609, 1614 (2015) (internal citation omitted). Therefore, a traffic stop may not ordinarily last any longer than necessary to address the traffic infraction. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* Tasks considered within the realm of an ordinary traffic stop include determining whether to issue a traffic ticket, checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Id.* at 1615. "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to

11

justify detaining an individual." *Id.* As explained by the Supreme Court, the Fourth Amendment will tolerate unrelated investigations so long as the roadside detention is not lengthened as a result. *Id.*

Recently, the Second Circuit clarified that *Rodriguez* abrogated its prior decision in *United States v. Harrison*, 606 F.3d 42 (2d Cir. 2010). *See Gomez*, 877 F.3d at 81. The Court explained that, under *Rodriguez*, "tasks not related to the traffic mission, such as dog sniffs or '[o]n-scene investigation into other crimes,' are unlawful if they prolong the stop absent independent reasonable suspicion." *Id.* at 89 (quoting *Rodriguez*, 135 S. Ct. at 1616). Thus, "the 'critical question' is not whether the unrelated investigation 'occurs before or after the officer issues a ticket,' but whether conducting the unrelated investigation 'prolongs—*i.e.*, adds time to—the stop." *Id.* (quoting *Rodriguez*, 135 S. Ct. at 1616); *see Rodriguez*, 135 S. Ct. at 1612 ("[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation." (alterations in original) (internal quotation marks omitted)).

A traffic stop may be extended "for investigatory purposes if an officer develops a reasonable suspicion of criminal activity supported by specific and articulable facts." *Foreste*, 780 F.3d at 523. "The existence of reasonable suspicion is not a purely legal issue; rather, it is a mixed question of law and fact dependent on the totality of the circumstances." *Gomez*, 877 F.3d at 92. Reasonable suspicion must be "supported by articulable facts that

criminal activity may be afoot," *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)), and it cannot be based on "inchoate suspicion or mere hunch," *id.* (quoting *United States v. Bayless*, 201 F.3d 116, 132-33 (2d Cir. 2000)). Although a court should evaluate the totality of the circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training," a court should not "merely defer to the police officer's judgment." *Id.* (quoting *Bayless*, 201 F.3d at 133).

Here, the Magistrate Judge cited *Harrison*—which has since been abrogated by the Second Circuit's holding in *Gomez*—in his analysis of the legality of the traffic stop. (Dkt. 281 at 10). However, the R&R's findings concerning the duration of the traffic stop were not based on *Harrison* or an analysis of the time needed to address the traffic infraction. Rather, the R&R concluded that Sitowski had reasonable suspicion to believe that the occupants of the vehicle might be engaged in criminal activity, thus justifying an extension of the traffic stop for investigatory purposes. (*Id.* at 12).

In his objections, Defendant argues that the stop should have concluded after Lewis passed his field sobriety test, and that the delay to allow for the canine to arrive and conduct a search was unreasonable. (Dkt. 297 at 2-3). Defendant contends that the Magistrate Judge improperly relied on *Harrison*, which held that unrelated questioning "subsumed" in a five- to six-minute traffic stop does not measurably prolong a stop so as to render it unconstitutional, 606 F.3d at 45. In *Harrison*, the court held that, although the officer had added time to the seizure by engaging in an inquiry unrelated to the traffic violation, the extension was reasonable. *Id.* However, in *Gomez*, the Second Circuit held that the

13

Supreme Court's holding in *Rodriguez*, 135 S. Ct. at 1612—that an unrelated investigation

that adds time to the stop violates the Fourth Amendment protection against unreasonable

seizures—had abrogated *Harrison*. 877 F.3d at 81. Thus, Defendant argues that, under

*Gomez* and *Rodriguez*, the continued seizure beyond the time necessary to effectuate the

traffic stop violated the Constitution.[1] (Dkt. 297 at 6).

The Government responds that although the R&R quotes *Harrison*, which was

Second Circuit precedent at the time the R&R was issued, it did not rely on the rationale

of that case in concluding that the duration of the stop comported with the Constitution.

(Dkt. 299 at 2). The Government contends that the R&R concluded that the officers had

reasonable suspicion of criminal activity that justified any extension of the stop. (*Id.* at 2-

3).

The Court need not resolve the question of whether Sitowski extended the seizure

beyond the time necessary to effectuate the traffic stop because ample evidence in the

record supports the R&R's conclusion that Sitowski had reasonable suspicion that criminal

activity was afoot and was therefore justified in prolonging the traffic stop. Sitowski

---

[1]    Defendant also argues that, unlike in *Gomez*, the good-faith exception does not apply. (Dkt. 297 at 5-6). In *Gomez*, although the court concluded that the stop was unconstitutional, it applied the good-faith exception to the exclusionary rule because the officers reasonably relied on *Harrison*, which was binding precedent at the time. 877 F.3d at 96. According to Defendant, the good-faith exception does not apply in this case, because the stop occurred in Oregon, and the Ninth Circuit had no bright-line standard at the time of the stop. (Dkt. 297 at 5). The Court would reach that argument only if it concluded that the duration of the stop was unconstitutional. Because the Court concludes that Sitowski had reasonable suspicion that criminal activity was afoot and the extension of the stop was therefore lawful, the Court need not address the applicability of the good faith exception.

testified that upon approaching the vehicle after initiating the traffic stop, he smelled "a strong odor of marijuana emitting from the vehicle, fresh marijuana." (Dkt. 217 at 18). He testified that he is familiar with the smell of both fresh and burnt marijuana, which, in his experience working in Southern Oregon, the "mecca for marijuana," are distinguishable odors. (*Id.*). Sitowski also testified that he observed that Lewis, the driver of the vehicle, moved slowly, appeared lethargic, and had "watery and bloodshot" eyes. (*Id.* at 20). Lewis told Sitowski that he had consumed alcohol and smoked marijuana earlier in the evening, but that there was no marijuana in the vehicle. (*Id.* at 26-27). Sitowski testified that after performing field sobriety tests on Lewis, he informed Lewis that the smell of marijuana emitting from the vehicle was not consistent with Lewis's statement that there was no marijuana in the vehicle. (*Id.* at 28-31). Sitowski asked Lewis a second time whether there was marijuana in the vehicle, and Lewis responded that he had a marijuana joint in his motorcycle jacket, which was located in the vehicle. (*Id.* at 31).

In his objections, Defendant argues that Sitowski's testimony about what he observed was not credible because Sitowski would not have been able to smell what ultimately turned out to be fresh marijuana vacuum-wrapped and sealed in the trunk of the car. (Dkt. 297 at 6-7). Defendant also suggests that Sitowski's basis for reasonable suspicion was pretextual, and that Lewis's admission that he had an unsmoked joint in his coat should have explained the smell of fresh marijuana. (*Id.*). The Court rejects those arguments. The Magistrate Judge found Sitowski's testimony credible, and the Court would have to discredit that testimony to conclude that the search was unlawful. A district court must give appropriate deference to the credibility determinations made by a

magistrate judge who heard the witness testimony. *See United States v. Raddatz*, 447 U.S. 667, 675-76 (1980); *Cullen v. United States*, 194 F.3d 401, 407 (2d Cir. 1999); *United States v. Lawson*, 961 F. Supp. 2d 496, 499 (W.D.N.Y. 2013); *United States v. Preston*, 635 F. Supp. 2d 267, 269 (W.D.N.Y. 2009). The Court finds no reason to question the credibility determination of the Magistrate Judge.

Furthermore, regardless of the source of the marijuana that Sitowski smelled, the Court agrees with the Magistrate Judge's conclusion that the fact that Sitowski smelled "a strong odor of marijuana" when he initially approached the vehicle gave him reasonable suspicion that criminal activity was afoot, if not probable cause. *See United States v. Simmons*, No. 13-CR-6025CJS, 2016 WL 285176, at *20 (W.D.N.Y. Jan. 22, 2016) (finding "overpowering" scent of burning marijuana provided reasonable suspicion justifying investigative detention of vehicle's occupants), *report and recommendation adopted*, No. 13-CR-6025, 2016 WL 1127802 (W.D.N.Y. Mar. 23, 2016); *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) ("It is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause."). Because the Court agrees that Sitowski developed reasonable suspicion upon initial contact with the vehicle, Defendant's arguments that the Magistrate Judge improperly relied on Sitowski's testimony that Defendant appeared "visibly intoxicated" in evaluating the reasonableness of the prolonged stop, and that the drug dog alerted to the side of the car, rather than the trunk, where the drugs were ultimately found, are of no

moment. (*See* Dkt. 297 at 7-8).[2]  The fact that Sitowski smelled marijuana upon approaching the vehicle was itself sufficient to justify prolonging the traffic stop.

Finally, the Court agrees with the R&R's conclusion that Sitowski's reasonable suspicion-based extension of the traffic stop comported with the requirements of the Fourth Amendment.[3]  (*See* Dkt. 281 at 17).  In making such a determination, courts consider "(1) whether the officer's action was justified at its inception; and (2) whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Foreste*, 780 F.3d at 526 (internal quotation marks omitted).  Here, as discussed above, the extension of the stop was justified.  The stop lasted about one hour, progressing swiftly with no significant delays.  For the reasons set forth in the R&R, the extension of the traffic stop comported with the Fourth Amendment. (*See* Dkt. 281 at 16-18).

Accordingly, for the reasons set forth above and in the R&R, this Court concludes that the traffic stop was not prolonged in violation of Defendant's Fourth Amendment rights and the search otherwise did not violate Defendant's constitutional rights.

---

[2]  Defendant argues that the fact that Defendant appeared "visibly intoxicated" should not have contributed to a finding of probable cause for the search of the vehicle. (Dkt. 297 at 7-8).  The Magistrate Judge did not rely on that observation in determining that there was probable cause to search the vehicle and its contents.  Rather, the R&R concluded that "Cookie's alert to the trunk seam and the passenger door of the vehicle . . . gave the police probable cause" for the search. (Dkt. 281 at 18).

[3]  Defendant has not raised in his objections an argument that, assuming there was reasonable suspicion to extend the stop, the extension was not reasonable.  However, the Court will address that issue because it is part of the analysis with respect to whether the duration of the stop was reasonable.

## 2. Ukiah, California Stop

### a. Legality of the Initial Stop

At oral argument, Defendant contended for the first time before this Court that the initial traffic stop was pretextual, and that there was a question as to whether there had actually been a traffic violation. Defendant made that argument during the suppression hearing held by the Magistrate Judge, as well as in his post-hearing briefs, but the Magistrate Judge rejected it, concluding that Murray had a reasonable belief that the driver of the vehicle violated a traffic law. (*See* Dkt. 281 at 27 n.3). The Court agrees with the Government that Defendant's argument is not properly before this Court. Fed. R. Crim. P. 59(b)(2) ("Failure to object in accordance with this rule waives a party's right to review."); *see Andino v. Fischer*, 698 F. Supp. 2d 362, 368 (S.D.N.Y. 2010) ("The Court is not required to review any portion of a Magistrate Judge's report that is not the subject of an objection." (citing *Thomas v. Arn*, 474 U.S. 140, 149 (1985))). Nonetheless, had Defendant raised the argument, the Court would defer to the Magistrate Judge's determination that Murray testified credibly as to his reasonable belief that a traffic violation had occurred, and the Court also agrees with the Magistrate Judge's legal conclusion that any mistake of law was reasonable (*see* Dkt. 281 at 27-28 n.3). *See Heien v. North Carolina*, ___ U.S. ___, 135 S. Ct. 530, 540 (2014).

### b. Duration of the Traffic Stop

Defendant's objections before this Court focus on the argument that, under *Gomez*, Murray unlawfully prolonged the traffic stop by asking questions about drugs when there was no obvious sign of drug use or activity and then beginning a drug investigation without

ever asking questions regarding the purpose of the traffic stop. (Dkt. 297 at 8-9). The Government responds that the R&R correctly concluded that Defendant consented to a search of the exterior of the vehicle before Murray had completed the record check on the driver, and that once consent was given, any extension of the stop was with the agreement of Defendant. (Dkt. 299 at 5-6).

The R&R correctly states that a law enforcement officer "may conduct unrelated checks during an otherwise lawful traffic stop," but "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 135 S. Ct. at 1615; (*see* Dkt. 281 at 28). Based on Murray's testimony, the Magistrate Judge concluded that "the consent to search the exterior of the vehicle occurred very early on in the encounter, even before Officer Murray had completed the record check on the driver and [Defendant]." (Dkt. 281 at 29). The record supports that conclusion. Murray testified that after stopping the vehicle, he obtained identifications from both occupants, provided dispatch with their driver's license numbers, and requested a full check. (Dkt. 219 at 68-69). While waiting for a response from dispatch, Murray asked if there were any illegal narcotics in the vehicle, including large amounts of marijuana or United States currency. (*Id.* at 68). He then asked if he could search the vehicle, and Defendant consented to a search of the exterior. (*Id.* at 69). Murray did not receive a response from dispatch regarding the occupants' license statuses and any warrants until within 30 seconds of the time that the canine was finishing his search. (*Id.* at 74).

Checking driver's licenses and determining whether there are outstanding warrants are part of a routine traffic stop and "serve the same objective as enforcement of the traffic

19

code: ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 135 S. Ct. at 1611. Because Murray inquired about illegal drugs while waiting for dispatch to run the driver's licenses, that inquiry did not prolong the stop. The Magistrate Judge correctly concluded that when Defendant provided consent to search the exterior of the vehicle, "he necessarily consented to an extension of the traffic stop long enough for the officers to conduct the search." *United States v. Davis*, 460 F. App'x 226, 232 (4th Cir. 2011); *United States v. Rivera*, 570 F.3d 1009, 1013-14 (8th Cir. 2009) ("When a motorist gives consent to search his vehicle, he necessarily consents to an extension of the traffic stop while the search is conducted. . . ."); (*see* Dkt. 281 at 29-30). Thus, Murray's inquiry into drug activity did not unlawfully prolong the traffic stop, and, in consenting to a search of the vehicle, Defendant consented to an extension of the stop.

### c.     Consent was Properly Given

The Government has the burden of proving, by a preponderance of the evidence, that consent to search was voluntary. *United States v. Calvente*, 722 F2d 1019, 1023 (2d Cir. 1983). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *United States v. Gandia*, 424 F.3d 255, 265 (2d Cir. 2005) (internal quotation marks omitted). The scope of a suspect's consent is a question of fact. *Id*. Here, the Magistrate Judge concluded

that the Government met its burden to prove that the consent was voluntary. (Dkt. 281 at 29).

Defendant challenges the Magistrate Judge's conclusion that Defendant's consent extended to a search of the exterior of the vehicle with the canine. (Dkt. 297 at 9). According to Defendant, Murray's testimony regarding Defendant's consent was inconsistent and not credible. (*Id.* at 10). At one point in his testimony, Murray testified that Defendant "did not want me searching the interior of the vehicle, but I was welcome to search the outside of the vehicle—that I can search the outside of the vehicle with my K-9 partner." (Dkt. 219 at 70). When asked on cross-examination what Defendant meant when he said that Murray could search the outside of the car, Murray responded, "They were indicating regarding the dog." (*Id.* at 107). When asked how he knew that, Murray responded, "They said you can search the outside of the vehicle. I said with my dog? And they said, yeah." (*Id.*). However, Murray had earlier testified, when asked whether either Defendant or the other occupant knew that he had a dog, "I'm sure they did. He barks a lot. I wear a big uniform, big patch on the back of my uniform that says Police K-9 Unit. . . . I mean, if they can read and they can hear, they probably would have known I had a police K-9." (*Id.* at 106). Defendant contends that he did not consent to a canine search of the vehicle.[4] The Government responds that this Court should defer to the Magistrate Judge's credibility determinations. (Dkt. 299 at 6); *see Carrion v. Smith*, 549 F.3d 583,

---

[4] Defendant also argues that the R&R improperly concludes that Defendant and the other occupant indicated their consent to the search by exiting the vehicle. (Dkt. 297 at 10). The Government is correct (Dkt. 299 at 6) that nowhere in the R&R does the Magistrate Judge draw any such conclusion.

588 (2d Cir. 2008) ("[A] district judge should normally not reject a proposed finding of a magistrate judge that rests on a credibility finding without having the witness testify before the judge.").

The R&R recounts the part of the record in which Murray testified about whether Defendant agreed to a search of the vehicle with the canine (Dkt. 281 at 23) and concludes that Defendant consented to the canine search, noting that Defendant did not hesitate to deny Murray consent to search the interior of the vehicle (*id.* at 29). The Court accepts the R&R's credibility determination, which is supported by the record.

Furthermore, Defendant's argument concerning the scope of the search misconstrues the constitutional requirements. In other words, Defendant's consent to the exterior search justified extension of the traffic stop, and Defendant has cited no authority for the notion that the Fourth Amendment requires specific consent to the means by which the exterior search was conducted (in this case, through a canine sniff). A canine sniff under these circumstances does not implicate Defendant's privacy interests. *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005) ("In this case, the dog sniff was performed on the exterior of [the defendant's] vehicle while he was lawfully seized for a traffic violation. Any intrusion on [the defendant's] privacy expectations does not rise to the level of a constitutionally cognizable infringement."); *see also City of Indianapolis v. Edmond*, 531 U.S. 32, 52-53 (2000) ("[A] 'sniff test' by a trained narcotics dog is not a 'search' within the meaning of the Fourth Amendment because it does not require physical intrusion of the object being sniffed and it does not expose anything other than the contraband items.").

Here, as in *Caballes*, the dog sniff was performed on the exterior of the vehicle during a lawful traffic stop. The sniff did not constitutionally infringe Defendant's privacy rights, and consent for the sniff was therefore not required.[5] In other words, there is no dispute that Defendant consented to an exterior search of the vehicle, thus justifying the prolonging of the stop for Fourth Amendment purposes. Even if Defendant did not knowingly consent to the scope of the search as including a canine sniff, that lack of knowing consent has no constitutional implications because Defendant's consent in that regard was not required. However, the record supports the Magistrate Judge's credibility determination that, in fact, Defendant consented to the canine sniff.

Accordingly, for the reasons set forth above and in the R&R, this Court concludes that the traffic stop was not prolonged in violation of Defendant's Fourth Amendment rights and the search otherwise comported with the Constitution.

### 3. San Francisco International Airport Stop

Defendant's sole objection to the R&R's conclusion regarding the stop at San Francisco International Airport is that the Magistrate Judge heard testimony from only one government witness and could not reasonably have concluded, based on that testimony alone, that the situation was not coercive and that Defendant validly consented to the search of the luggage. (Dkt. 297 at 11). The Government responds that Defendant presents no

---

[5]     At oral argument, Defendant conceded that he had not challenged the drug dog's credentials but nonetheless raised the fact that the dog had made a positive indication, yet no drugs were found in the vehicle. Defendant's specific argument in that regard is unclear, but the Court notes that "we do not evaluate probable cause in hindsight, based on what a search does or does not turn up." *Florida v. Harris*, 568 U.S. 237, 249 (2013).

evidence that the Magistrate Judge's determinations on this issue were erroneous. (Dkt. 299 at 7).

Whether consent was voluntary or was mere acquiescence to authority or submission to coercion is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). The Fourth Amendment requires "that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." *Id*. at 228. "For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Id*. In examining the circumstances surrounding a defendant's consent, "account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Id*. at 229.

For the reasons set forth in the R&R, the Court agrees that the Government met its burden to prove valid consent. The record reflects that law enforcement did not use threats, force, or coercive tactics in their encounter with Defendant. Molyneaux approached Defendant in the luggage carousel area, identified himself, and asked to speak with Defendant for a minute. (Dkt. 151 at 19). Another officer then joined them and identified himself. (*Id*. at 20). Both officers were in plain clothes, and Molyneaux testified that his weapon was not visible. (*Id*. at 19-20). The encounter took place in public, and Molyneaux specifically advised Defendant that he was not under arrest and was free to leave at any time. (*Id*. at 22). When asked whether he would consent to a search of his luggage, Defendant responded, "I don't have any drugs, go ahead." (*Id*. at 26). Nothing about that

24

encounter suggests that it was coercive or that Defendant's consent was not voluntarily given. Defendant suggests no reason why Molyneaux's testimony did not present a "sufficient view of the entirety of the circumstances," or why "other testimony for comparison" should have been required. (Dkt. 297 at 11). Again, the Court defers to the Magistrate Judge's credibility findings.

Accordingly, the Court agrees with the R&R's conclusion that the Government met its burden to establish that Defendant's consent to search his luggage was valid.

## II.     November 7, 2017, Decision and Order on the Speedy Trial Exclusion

The final issue before this Court is the Government's appeal of the D&O's speedy trial clock determination. (Dkt. 282). After the suppression hearings were held, the Government's post-hearing brief was due on June 19, 2017. (Dkt. 246). The Government missed that deadline and filed neither a brief nor a request for an extension of time by that date. Instead, the Government filed its brief on July 13, 2017 (Dkt. 252), along with a cover letter to the court that Defendant conceded should be construed as a letter motion to allow late filing (Dkt. 282 at 6 n.2; Dkt. 257 at ¶ 23). The Government then filed a formal motion for leave to file late on July 18, 2017. (Dkt. 253). The Magistrate Judge granted the Government's motion for leave to file out of time but ultimately concluded that the time between June 19, 2017, and July 13, 2017, was not excluded from the speedy trial clock. (*Id.* at 6).

The D&O concluded that the time period resulting from the Government's unexcused delay was not automatically excluded from the speedy trial clock as "delay resulting from any pretrial motion." 18 U.S.C. § 3161(h)(1)(D); (Dkt. 282 at 5). The D&O

explained that, "[i]f adopted, the government's position would essentially allow the government to be in control of the defendant's statutory right to a speedy trial." (Dkt. 282 at 5). The D&O also noted that a court may not order *nunc pro tunc* Speedy Trial Act exclusions. (*Id.*).

### A. Standard of Review

Because the Government appeals to this Court from a non-dispositive determination, to warrant reversal by this Court, it must demonstrate that the decision is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Garcia v. Teitler*, 443 F.3d 202, 211 (2d Cir. 2006) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). "This standard is highly deferential, imposes a heavy burden on the objecting party, and only permits reversal where the magistrate judge abused his discretion." *Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 954 F. Supp. 2d 127, 139 (E.D.N.Y. 2013) (quotations omitted); *see also S.E.C. v. Verdiramo*, 890 F. Supp. 2d 257, 266 (S.D.N.Y. 2011) ("The clearly erroneous standard is highly deferential, and magistrate judges are afforded broad discretion in resolving non-dispositive disputes. . . ." (internal quotation marks omitted)).

### B. Analysis

The Speedy Trial Act excludes "[a]ny period of delay resulting from other proceedings concerning the defendant, including but not limited to . . . delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on,

or other prompt disposition of, such motion[.]" 18 U.S.C. § 3161(h)(1)(D). In *Henderson v. United States*, 476 U.S. 321 (1986), the Supreme Court held that the subsection of the Speedy Trial Act now codified as § 3161(h)(1)(D) excludes "all the time between the filing of a motion and the conclusion of the hearing on that motion, whether or not a delay in holding that hearing is 'reasonably necessary.'" *Id.* at 330. The Court also held that that subsection "excludes time after a hearing has been held where a district court awaits additional filings from the parties that are needed for proper disposition of the motion." *Id.* at 331. Then, once any hearing has been held and briefing has been completed, the Speedy Trial Act excludes "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court." 18 U.S.C. § 3161(h)(1)(H).

In *United States v. Adeniji*, 31 F.3d 58 (2d Cir. 1994), the Second Circuit noted that "[w]hether the Government's delay in filing response papers to a defendant's motion can be excluded under the Speedy Trial Act is an open question in this circuit." *Id.* at 66. Other circuits are split on that question. The Seventh Circuit, in a case decided one month before *Henderson*, held that a "motion must be deemed 'under advisement' as soon as the prosecutor's response was due, no matter when the prosecutor filed." *United States v. Thomas*, 788 F.2d 1250, 1259 (7th Cir. 1986). The Seventh Circuit concluded that "[t]he due date rule is consistent with the [Speedy Trial] Act. It fixed an easily ascertained time to shift the case to the 'advisement' exclusion . . . yet it preserves flexibility of the parties to seek additional time (to extend the due date) if more is necessary." *Id.* at 1260.

In this case, the D&O relied in part on *Thomas*, finding that the time period resulting from the Government's unexcused delay was not automatically excluded under § 3161(h)(1)(D). (Dkt. 282 at 5). However, the D&O specifically declined to adopt the aspect of the *Thomas* decision that held that the 30-day advisement period starts on the due date of the government's response—the "due date rule." (Dkt. 282 at 5 n.1). Under *Thomas*, Defendant's motion to suppress would have been taken under advisement on the date that the Government's post-hearing brief was due (June 19, 2017), and the 30-day advisement period would have started to run on that date. Instead, the Magistrate Judge continued to accept filings necessary for proper disposition of the motion after the Government's due date—specifically, the Government's brief (Dkt. 252), on July 31, 2018 (*see* Dkt. 282 at 2); Defendant's reply brief, on August 16, 2017 (Dkt. 266); and the Government's opposition to Defendant's reply brief, on August 23, 2017 (Dkt. 270). Pursuant to the Magistrate Judge's express findings, the motion was not taken under advisement until August 23, 2017, after the Magistrate Judge received those submissions. (Dkt. 272; Dkt. 280). Then, on September 22, 2017, and again on October 23, 2017, the Magistrate Judge extended the advisement period and excluded time from the speedy trial clock in the interests of justice, ultimately until November 6, 2017, for the purposes of considering the issues raised by the pretrial motions and rendering a decision. (Dkt. 272; Dkt. 280).

The Fifth and Sixth Circuits have reached conclusions contrary to the Seventh Circuit's reasoning in *Thomas*. In *United States v. Martinez-Mercado*, 888 F.2d 1484 (5th Cir. 1989), the court rejected the defendant's argument that the 15-day period between the

due date of the government's response and the date on which the late response was filed was not excludable under the provision now codified as § 3161(h)(1)(D). *Id.* at 1493. The court relied on *Henderson*'s holding that exclusion under that provision is not limited to only *reasonably necessary* delays between the time of filing of a motion and the conclusion of the hearing on the motion. *Id.* Similarly, in *United States v. Montgomery*, 395 F. App'x 177 (6th Cir. 2010), the court rejected, in dicta, the argument that the eight days between the deadline for the government's response to the motion to suppress and the date that the response was actually filed was non-excludable, noting that "[o]ur research . . . has revealed no legal authority for [the defendant's] position." *Id.* at 181 n.4.

The Court concludes that the holding in *Henderson* supports requiring the automatic exclusion of a delay until completion of briefing on a pretrial motion, even if the Government misses the due date for filing that briefing. Here, until the Magistrate Judge received the Government's post-hearing brief, he was "await[ing] additional filings from the parties that [were] needed for proper disposition of the motion." *Henderson*, 476 U.S. at 331. The Fifth and Sixth Circuits have persuasively interpreted *Henderson* as requiring exclusion under these circumstances, and the Court is not persuaded by the Seventh Circuit's reasoning in *Thomas*. Although *Thomas* has not been overruled, the Seventh Circuit did not have the benefit of the Supreme Court's decision in *Henderson* when it issued that decision.

Moreover, this Court disagrees with the D&O's decision to follow *Thomas* in part, which in essence results in a gap of time within the exclusion under § 3161(h)(1)(D). In this Court's view, time is either excluded under § 3161(h)(1)(D) until conclusion of any

29

hearing and completion of any briefing, or it is not. It does not seem appropriate to have a gap within that period when time is tolled from the speedy trial clock pursuant to § 3161(h)(1)(D). Once the clock is no longer stopped by § 3161(h)(1)(D), then the matter should be taken under advisement (at which time, the clock is stopped under § 3161(h)(1)(H)). That is, in essence, the holding of the *Thomas* court, but in this case the Magistrate Judge did not have sufficient information to take the matter under advisement when the Government missed its filing deadline. Rather, the Magistrate Judge specifically noted that he did not take the matter under advisement until August 23, 2017, well after the Government's missed deadline for filing its brief. The Court notes that Defendant does not argue that the Magistrate Judge should have followed *Thomas* and taken the matter under advisement on the date when the Government's brief was due—indeed, Defendant made an additional filing after the Government's missed deadline.

This conclusion does not give the Government unfettered control over a defendant's speedy trial rights. A court has the power to decline to accept a late-filed brief. Here, the Magistrate Judge could have declined to accept the Government's late-filed brief, or any additional submissions, and the matter could have been taken under advisement as of June 19, 2017. But understandably, the Magistrate Judge needed additional submissions to appropriately consider the pretrial motion, granting the Government permission to file its brief after the deadline and receiving additional filings until the matter was ultimately taken under advisement on August 23, 2017—approximately two months after the Government's missed deadline.

Finally, *United States v. Tunnessen*, 763 F.2d 74 (2d Cir. 1985), does not dictate a different result. The court in *Tunnessen* held that "time may not be excluded based on the ends-of-justice unless the district court indicates at the time it grants the continuance that it is doing so upon a balancing of the factors specified by section [3161(h)(7)]." *Id.* at 78. The court continued: "A prospective statement that time will be excluded based on the ends of justice serves to assure the reviewing court that the required balancing was done at the outset." *Id.* The stopping of the speedy trial clock between June 19, 2017, and July 13, 2017, is based on the automatic statutory exclusion under § 3161(h)(1)(D), not a discretionary interests of justice exclusion under § 3161(h)(7). Delays are excluded in the interests of justice only if the judge finds that "taking such action outweigh[s] the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A). Exclusions under that provision are effective only if the district court makes the required findings and records them at the time of the finding. *See Bloate v. United States*, 559 U.S. 196, 210 (2010). Thus, the Second Circuit's conclusion that exclusions under that provision cannot be granted *nunc pro tunc* has no bearing on an automatic statutory exclusion under § 3161(h)(1)(D).

Accordingly, the Court concludes that the D&O's determination that the time between June 19, 2017, and July 13, 2017, was not automatically excluded from the speedy trial clock under 18 U.S.C. § 3161(h)(1)(D), was clearly erroneous and is reversed.

## CONCLUSION

The Court has carefully reviewed the R&R and the record pertaining to the suppression motion, including the filings before the Magistrate Judge and the transcripts of the suppression hearings on March 30, 2016, January 9, 2017, January 10, 2017, and January 19, 2017. Based on its *de novo* review, the Court hereby denies Defendant's motion to suppress the evidence and statements obtained on March 10, 2011, November 8, 2013, and January 13, 2014 (Dkt. 82), and the Court accepts and adopts the R&R (Dkt. 281) and overrules Defendant's objections (Dkt. 297).

The Court also reverses the November 7, 2017, D&O concluding that the time between the due date of the Government's post-hearing brief and the date on which the Government actually filed its brief and moved for late filing was not excluded from the speedy trial clock. (Dkt. 282). The Court concludes that the period of time between June 19, 2017, and July 13, 2017, is excluded from the speedy trial clock pursuant to 18 U.S.C. § 3161(h)(1)(D).

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: March 2, 2018
       Rochester, New York